UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:10 CR 239 RWS / DDN |
| | ) | |
| MARCO ANTONIO RIVERA-APODACA, | ) | |
| RAMON VAZQUEZ-RODRIGUEZ, | ) | |
| FRANCISCO VARELA, and | ) | |
| JOHN WARREN SONES, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court on the motions of the parties which were referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Pending before the court are the motions (a) of defendant Ramon Vazquez-Rodriguez (Vazquez) to sever (Doc. 103); and (b) of defendant Marco Antonio Rivera-Apodaca (Rivera) to suppress evidence (Doc. 99), for disclosure of impeaching evidence (Doc. 100), and for disclosure of Rule 404(b) evidence (Doc. 101). An evidentiary hearing on the pending matters was held on July 15, 2010.

**JOINDER AND SEVERANCE**

Defendant Vazquez has moved to sever his trial from that of co-defendants Francisco Varela and John Warren Sones. Vazquez argues that on April 11, 2010, these co-defendants gave post-arrest statements that implicated Vazquez and co-defendant Rivera in criminal activity. He further argues that these statements could be offered by the government at a joint trial as evidence against Varela and Sones, and the jury could conclude not only that Varela and Sones were guilty but also infer that Vazquez was guilty, even if his name is redacted from the statements. And if Varela and Sones did not testify in their defense, under <u>Bruton v. United States</u>, 391 U.S. 123 (1968), Vazquez would be denied his right to confront them by cross-examination.[1]

---

[1]Counsel for Vazquez anticipates that Sones and Varela will testify for the government at trial against Vazquez, but has moved for severance in the event that they do not do so. At the pretrial hearing, counsel for

Defendant Vazquez is charged in Count 1 with defendants Rivera, Varela, and Sones with conspiracy, from a time unknown to the grand jury until April 11, 2010, to possess and to distribute more than 1000 kilograms of marijuana.  (Doc. 39 at 1.)  Varela and Sones are charged in Count 2 with interstate travel to carry on the conspiracy alleged in Count 1.  (Id. at 2.)

In determining whether Vazquez is entitled to a trial separate from Varela and Somes, the court must decide whether his joinder with them (1) was proper under Federal Rule of Criminal Procedure 8, and (2) is likely to have a "substantial and injurious effect or influence in determining the jury's verdict." United States v. Lane, 474 U.S. 438, 449 (1986) (internal quotations omitted).  The propriety of the joinder generally must appear on the face of the indictment.  United States v. Wadena, 152 F.3d 831, 848 (8th Cir. 1998); United States v. Andrade, 788 F.2d 521, 529 (8th Cir. 1986).

Vazquez is properly joined with the others under Rule 8(b) for a joint trial of Count 1, because on the face of Count 1 they are charged with the same crime.  See Fed. R. Crim. P. 8(b)(two or more defendants may be charged in the same indictment if alleged to have participated in the same offense).  He is also properly joined under Rule 8(a) for a joint trial with Varela and Somes of Counts 1 and 2, because the express allegations in Count 2 are dependent upon the crime alleged in Count 1.  See Fed. R. Crim. P. 8(a) (a defendant may be charged with more than one offense in one indictment, if the offenses have a common factual basis).    Even if joinder was proper under Rule 8, severance under Rule 14(a) may be required if there is a showing of sufficient prejudice by the joinder. United States v. Jenkins-Watts, 574 F.3d 950, 967 (8th Cir. 2009).  The court believes such is not the case with Vazquez's joinder.

There is a presumption that all charged co-conspirators should be tried together when the proof against each is based upon the same facts and evidence.  See United States v. Frazier, 280 F.3d 835, 844 (8th Cir.

---

the government indicated that he expected that by the time of Vazquez's trial the charges against Varela and Somes will be resolved and that they would testify.  If the expectations of counsel are realized, the confrontation issue argued by Vazquez would be moot. However, the court ought to decide the severance issue at this time in the event they do not testify at trial.

2002). There is a strong presumption that a joint trial is appropriate, because a joint trial provides the jury with a larger view of relevant evidence and increases the likelihood of a correct outcome. United States v. Flores, 362 F.3d 1030, 1039 (8th Cir. 2004); see also United States v. Jenkins-Watts, 574 F.3d at 967.

Some factors may require pre-trial severance, e.g., when the government intends to offer a confession against one defendant which would incriminate a co-defendant. In such a case, the non-confessing co-defendant may be entitled to a separate trial to avoid the prejudice of not being able to cross-examine the declarent. Bruton v. United States, 391 U.S. at 136. Such prejudice can be avoided by the redaction from the confession of any reference to the co-defendant. United States v. Bolden, 92 F.3d 686, 687 (8th Cir. 1996).

Very often, relevant factors cannot be fully evaluated until during trial, such as the effect of redacting the statements, the effect of limiting instructions, the strength of the government's evidence, and the number of defendants tried jointly. United States v. Sazenski, 833 F.2d 741, 745-46 (8th Cir. 1987).

For these reasons, the court will deny Vazquez's motion to sever without prejudice. If sufficient prejudice is shown during a joint trial, defendant Vazquez may refile his motion to sever.

**PRETRIAL DISCOVERY**

Defendant Rivera has moved for disclosure of impeachment information under Brady v. Maryland, 373 U.S. 83 (1963) (Doc. 100) and for notice from the government of any intention to use evidence that would be admissible under Federal Rule of Evidence 404(b). In response to these motions, counsel for the government has indicated that the government is aware of its duty under Brady and will comply with that duty, and that the government does not have Rule 404(b) evidence.

For these reasons, the motions of defendant Rivera will be denied.

**MOTION TO SUPPRESS**

Defendant Rivera has moved to suppress his statements and the physical evidence seized at the time of his arrest. (Doc. 93.) From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

March 29, 2010

1.  On March 29, 2010, Immigration and Customs Enforcement (ICE)[2] Special Agent Aaron Chapman[3] received information from a fellow law enforcement task force[4] officer concerning suspicious activity at a Drury Inn hotel located at Interstate 44 and Bowles Avenue in St. Louis County. Agent Chapman was told that a hotel employee reported that persons, later identified as Marco Antonio Rivera-Apodaca (Rivera) and Ramon Vazquez-Rodriguez (Vazquez), had checked into the hotel around 5:30 a.m. Vazquez had used a legal permanent resident card ("green card") for identification and paid cash for the room.[5] Agent Chapman ran a record check on Vazquez and learned his legal permanent resident card had recently been used to cross the border legally into the United States. Agent Chapman then, that same day, went to the hotel.

2.  At the hotel, Agent Chapman met the task force officer who had given Chapman the information provided by the hotel employee. The hotel also provided the officers with the names of the individuals the hotel believed were suspicious. Agent Chapman identified the vehicle on the hotel parking lot, which had been previously indicated by the hotel employee as belonging to the subjects, a silver Chevrolet Cobalt automobile with Montana license plates. Agent Chapman looked into the vehicle through its windows and saw that it had a "lived in" look: items of clothing and empty drink containers were scattered about inside the vehicle; a pile of sunflower seeds sat outside the passenger door while an empty sunflower seed container sat just inside the door; and a towel was draped across the ignition keyhole, which Agent Chapman noted was consistent with vehicles that had been broken into. Agent Chapman did a record check on the vehicle. Another officer learned that it was rented to Vazquez's mother, whose surname was also Vazquez, and that the

---

[2]ICE is a component of the Department of Homeland Security.

[3]As will be made relevant later, on March 29, 2010 Agent Chapman wore a full beard. See footnote 10.

[4]The task force was comprised of ICE agents and members of local law enforcement departments.

[5]In Agent Chapman's experience, although not unheard of, it is unusual for a green card to be presented for identification to check into a hotel; usually a driver's license or a passport is used for this purpose.

rental company reported that she was the only one authorized to drive of the vehicle.

3.     The task force officers kept the Cobalt under surveillance on the hotel lot.  They observed a person, later identified as Ramon Vazquez-Rodriguez, come out of the hotel and smoke a cigarette.  Vazquez returned inside the hotel.  Later the officers saw Vazquez and another person, later identified as Marco Antonio Rivera-Apodaca, come out of the hotel, smoke a cigarette, and walk around the parking lot, covering an unusually large area.[6]  This conduct appeared suspicious to the officers as indicative of counter-surveillance techniques.

4.     Around 8:30 or 9:00 p.m. that night Rivera and Vazquez left the hotel in the silver Chevrolet Cobalt, with Rivera driving the Cobalt.  Agent Chapman and other officers followed them as they drove eastbound from the hotel to Collinsville, Illinois.  At some point, one of the ICE agents contacted the Collinsville police department and requested assistance with a traffic stop.  Collinsville Police Officer Michael Reichert responded in a marked patrol car.  While in communication with the ICE agents concerning the description of the vehicle, Officer Reichert entered eastbound Interstate Highway 55/70 via Illinois Route 159.  He soon found and identified the silver Chevrolet Cobalt with Montana license plates.  The ICE agent told Officer Reichert that the Cobalt had changed lanes without using a turn signal.  Based on that information, Officer Reichert pulled the Cobalt over after following it for approximately one mile.  Officer Reichert got out of his marked vehicle, approached the vehicle, and asked the driver, Rivera, for identification.  Rivera gave him a document other than a driver's license.  At that time, the ICE agents and Illinois State Police officers arrived on the scene.  Officer Reichert turned the situation over to the ICE agents.  Officer Reichert did not issue the Cobalt's occupants a citation or make a police report concerning the stop.  He remained on the scene until later, when Rivera and Vazquez were allowed to drive the Cobalt away from the scene.

5.     Upon arriving at the scene of the stop, Agent Chapman walked up to the Cobalt.  Rivera was in the driver's seat and did not speak

---

[6]In Agent Chapman's experience of conducting surveillance on hotels, guests exiting a hotel in order to smoke generally stand just outside the door or nearby.

- 5 -

English; passenger Vazquez, however, spoke English. Both were cooperative. Agent Chapman, speaking in Spanish, asked Rivera for his identification. Rivera stated that he did not have any identification. Chapman asked him whether he was a U.S. citizen. Rivera said that he was a Mexican citizen, and that he was in the United States illegally. Agent Chapman questioned Rivera about a possible match to a record he found which indicated that Rivera may have crossed into the United States legally. Rivera denied that the record referred to him and continued to indicate he was in the United States illegally.

6. Agent Chapman spoke in English with Vazquez and Vazquez responded in English. Chapman asked him for identification and Vazquez presented a legal permanent resident card.

7. Agent Chapman asked Rivera and Vazquez to step out of the Cobalt and they did so. Rivera and Vazquez were separated ten to fifteen feet from one another while the officers spoke to them. Both separately told Agent Chapman they were traveling to Indiana to visit Vazquez's sick grandmother. Vazquez said Rivera was on the trip, because Vazquez's driver's license had been suspended or revoked, and he had asked Rivera to accompany him so that Rivera could drive. However, Agent Chapman found no record indicating that Rivera had a driver's license in the United States, and Rivera was not carrying a driver's license from Mexico.

8. Agent Chapman then asked both Rivera[7] and Vazquez for permission to search the Cobalt. Each consented orally to Agent Chapman's request and Rivera at a later date signed a written consent

---

[7]No evidence was adduced about Rivera's age and level of education. The undersigned, from observing Rivera in the courtroom, finds that on March 29, 2010, he was of mature age and had a mental ability sufficient to understand what Agent Chapman was saying to him in Spanish and to converse with the agent in an intelligible manner. These findings are corroborated by the information adduced during the initial appearance of defendant Rivera before Chief Magistrate Judge Mary Ann Medler on April 12, 2010, wherein it was recorded that Rivera was born on January 26, 1976, was married with two children, and was employed as a professional driver and chauffeur. (Doc. 10 at 2.)

form.[8]  Thereafter, the vehicle was searched, but no contraband was found and nothing was seized.[9]

    9.  A narcotics dog was brought to the vehicle.  The dog indicated an interest in the engine compartment, but did not alert to the presence of narcotics.  Agent Chapman and the task force officers allowed Rivera and Vazquez to go on their way in the Cobalt.

### April 11, 2010

    10.  Early in the morning of April 11, 2010, Agent Chapman was notified by a task force officer that an employee at another Drury Inn hotel, located at the intersection of Interstate 44 and Highway 141, had called to report that certain individuals at the hotel were engaging in suspicious activity.  The suspicious activity occurred at the hotel front desk during check-in.  Hotel personnel said the subjects checked in and told the hotel they had a red passenger vehicle with Oklahoma registration; one of the guests gave his name as Vazquez; and a legal permanent resident card was used as identification.

    11.  Agent Chapman went to the hotel and learned from a hotel employee that two subjects, named Rivera and Vazquez, had arrived and began to wait for people they described as their friends; that after a while two friends arrived;[10] that the four of them argued about where they were going; that Vazquez corrected them and they settled on one story; that the four were now staying at the hotel; and that Vazquez paid the hotel in cash for the four to stay in two rooms.  Vazquez and Rivera had told the hotel employee that they drove a red passenger vehicle with Oklahoma license plates.  However, Agent Chapman could not locate such a vehicle in the parking lot, but instead found the same

---

[8]The government acknowledges that this consent form has not been produced; the location of the form is unknown and efforts to locate it are ongoing.

[9]In his motion to suppress, counsel for defendant Rivera states that "[i]nside the vehicle were a prepaid phone, a large quantity of religious medallions, Patron Saints cards and minimal luggage.  Due to the lack of police report regarding this stop, the undersigned assumes that these items were seized or alternatively used for investigative purposes."  See Doc. 99 at 2.  The hearing evidence was clear and not disputed that no physical evidence was seized from the Cobalt.

[10]The two friends, later identified as Francisco Varela and John Warren Sones, arrived in a truck pulling a trailer.

silver Chevrolet Cobalt with Montana license plates that Vazquez and Rivera previously occupied on March 29.

12. Officers set up surveillance on the two vehicles and noted that the four subjects exhibited similar counter-surveillance behavior as Rivera and Vazquez did on March 29. The officers saw Varela and Sones frequently walk out onto the parking lot and walk around the truck and trailer, which were parked up against the hotel. Officers noted that on some occasions when Vazquez walked around the parking lot, he looked up at the window of another subject and gestured, in a manner the officers regarded as unusual.

13. Later that evening, Rivera and Vazquez left the hotel and drove away in the silver Chevrolet Cobalt automobile. One of the officers conducting surveillance had previously requested assistance from a local police department, which sent an unmarked vehicle to wait nearby. As Rivera and Vazquez drove out of the hotel parking lot, they were seen by the officers to change their behavior. Instead of driving away from the area, Rivera and Vazquez immediately pulled into a gas station across the street from the hotel. There they bought gas, waited a few minutes, and drove away onto westbound Interstate 44. Believing Rivera and Vazquez must have seen the unmarked police vehicle, Agent Chapman had the unmarked vehicle leave the area because its presence appeared to make Rivera and Vazquez nervous. The unmarked police vehicle left and passed Rivera and Vazquez driving west on Interstate 44. Rivera and Vazquez then exited Interstate 44 onto Highway 109, and pulled into another gas station. Agent Chapman and other officers established a loose perimeter around this gas station. Vazquez went inside the service station for a few minutes, with Rivera waiting outside.

14. Shortly after Rivera and Vazquez left the hotel, Varela and Sones left the hotel in the truck and trailer. Other officers, with whom Agent Chapman remained in radio contact, followed. Varela and Sones began traveling east on Interstate 44, in the direction of the Cobalt, when officers pulled them over. As soon as Agent Chapman learned that Varela and Sones had been stopped, he approached Rivera and Vazquez, who were still sitting at the gas station at Interstate 44 and

Highway 109. Neither recognized Agent Chapman as the agent who questioned them on March 29.[11]

15. Rivera and Vazquez were questioned separately. Vazquez variously told Agent Chapman that they were traveling from New Jersey; later he told the agent they were traveling from Tennessee. In answer to Agent Chapman's questions, Rivera said they were coming from New York. Agent Chapman recollected that on March 29 they said they were going to Indiana.

16. Agent Chapman asked Rivera if the Chevrolet Cobalt could be searched and Rivera orally agreed. Chapman then prepared a written Consent To Search form, Government Exhibit 1, for the automobile. The agent handwrote on the form[12] the officers' identifications, the description of the vehicle, and the location of the vehicle. Agent Chapman then explained the form to Rivera in Spanish and asked him whether he understood the consent. Rivera said he understood the form as the agent explained it in Spanish and he gave his consent to the search. Chapman then asked him to sign his name on the form, which Rivera did in three places. See Gov. Ex. 1.

17. Thereafter, the agent searched the Cobalt vehicle. In the search, several items were seized, including several receipts, which indicated Rivera and Vazquez had traveled in Pennsylvania and New York, and some postcards. Also, a trained narcotics dog sniffed the vehicle and alerted to the Cobalt's trunk area, where a hidden compartment was found, but no contraband was found.

18. The truck and trailer were sniffed by a trained narcotics dog who alerted to that vehicle. A St. Louis County narcotics unit then went from the scent of the truck and trailer to the gas station. There they told Agent Chapman that a narcotics dog had positively alerted to the trailer indicating the presence and/or odor of narcotics.[13]

---

[11]On April 11 Agent Chapman was clean shaven. See footnote 2.

[12]The form was preprinted in English.

[13]Although no evidence of this was adduced during the instant hearing, defendant Rivera does not gainsay the prosecutor's description of the search of the truck and trailer:

> A search of that vehicle resulted in the seizure of approximately $283,000 in United States currency, which was hidden in a secret compartment. The other two individuals

19.  Rivera and Vazquez were then arrested and taken to the St. Louis County police station.  Physical evidence was seized from the persons of Rivera and Vazquez on April 11, 2010.[14]

**DISCUSSION**

Defendant Rivera seeks the suppression of the evidence acquired from him by the government on March 29 and April 11, 2010.  The only evidence acquired from him on March 29 that he has standing to complain about are the statements he made to the agents.  No physical evidence was seized from him or from the Chevrolet Cobalt vehicle on that date before he and defendant Vazquez were allowed to go about their business.  On April 11, 2010, federal law enforcement agents seized items during a search of the Cobalt automobile, defendant Rivera made statements to the agents, and items were seized from his person after his arrest.

Defendant Rivera argues that the stops of the Chevrolet Cobalt by law enforcement on both dates were in violation of the Fourth Amendment.  The Fourth Amendment provides in pertinent part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

The vehicle stop on March 29 involved a traffic stop.  Under the Fourth Amendment, the overarching factor is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."  Terry v. Ohio, 392 U.S. 1, 19 (1968).  In this regard, law enforcement authorities may stop a motor vehicle without a warrant lawfully for the violation of a state traffic law.  United States v. Linkous, 285 F.3d 716, 719-20 (8th Cir. 2002).  On March 29, the federal agent advised Collinsville Police Officer Reichert that the Chevrolet Cobalt had changed lanes without using a turn signal.  This

---

admitted that this money was the proceeds of the sale of the marijuana and that Ramon Vasquez-Rodriguez and Marco Rivera-Apodaca had been involved in the sale of the marijuana as well and that they had been involved in prior marijuana sales as well. . . .  Incident to their arrests, personal items were seized from the persons of Ramon Vasquez-Rodriguez and Marco Rivera-Apodaca.

(Doc. 107 at 5.)

[14] See footnote 13.

is a violation of Illinois state law.  See 625 ILCS 5/11-804(d)(1975).
The police officer stopped the Cobalt and began a traffic stop
procedure, but then turned the matter over to the federal agents.

An officer who stops a vehicle and its driver for violating a state
traffic law must limit his or her investigatory actions to the needs of
pursuing and concluding the purposes of the traffic stop. United States
v. Linkous, 285 F.3d at 719-20.  Irrespective of Officer Reichert's
intention to support the federal agents in their more serious criminal
investigation, and their intentions in that regard, his asking the
driver for identification was well within the lawful scope of law
enforcement activities in a valid traffic stop.  Id.

Rivera argues that the stop was illegal because he was not given
a citation for any traffic law offense, no police report of the incident
was made, and the federal immigration authorities did not take him into
custody when he admitted he was in the United States illegally.  These
facts do not demean the lawfulness of the stop as a traffic stop,
because defendant does not deny that the agents observed him commit the
asserted violation of the Illinois traffic laws and that this
information was communicated to the police officer.  Law enforcement may
engage in a valid traffic stop even though simultaneously investigating
more serious criminal suspicions about the subject of the stop. United
States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009).

Defendant Rivera argues that, even if the Cobalt was lawfully
stopped for the enforcement of the Illinois traffic laws, this detention
beyond the period of time necessary to complete the traffic stop, was
illegal.  United States v. Bracamontes, --- F.3d ---, No. 09-3897, 2010
WL 3034676 at *2 (8th Cir. Aug. 5, 2010).  Agent Chapman picked up the
stop from Officer Reichert and did not immediately exceed the lawful
bounds of a valid traffic stop.  Agent Chapman asked the occupants of
the vehicle for identification and ultimately asked them to step out of
the vehicle, which they did.  Pennsylvania v. Mimms, 434 U.S. 106, 111
(1977)(reasonable for the officer to have the driver step out of the
vehicle); Maryland v. Wilson, 519 U.S. 408, 415 (1997)("an officer
making a traffic stop may order passengers out of the car pending the
completion of the stop"); United States v. Cloud, 594 F.3d 1042, 1044-45
(8th Cir. 2010).  The statements made by Rivera until the agent asked
for permission to search the vehicle were made during the course of the
valid traffic stop.   Agent Chapman exceeded the reasonable bounds of

a traffic stop when he asked permission to search the Cobalt. However, this fact did not render the continued stop unlawful.

From its inception, the stop was lawful under the Fourth Amendment other than as a traffic stop. The federal agents lawfully caused the stop of the Cobalt on March 29, for further investigation, because they had seen acts by Rivera and Vazquez that reasonably indicated that they had been or were about to commit criminal acts. United States v. Arvizu, 534 U.S. 266, 273 (2002); Terry v. Ohio, 392 U.S. 1, 24 (1968); United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005).

In Arvizu, a border patrol agent stopped a minivan being driven in a remote area of southeastern Arizona. He did so after considering facts that indicated to him a reasonable suspicion that the van was being used to violate federal immigration laws. The District Court denied the motion to suppress based upon ten factors. The Ninth Circuit reversed, ruling that seven[15] of the ten factors carried little or no weight and the remaining three[16] were an insufficient basis for the stop. 534 U.S. at 272.

The Supreme Court reversed, holding that a court's analysis of the basis for an investigatory stop must consider the totality of the circumstances, the relevant factors in conjunction with one another, and the expertise of the law enforcement officer's assessment of whether what was observed established a reasonable suspicion of criminal activity. Id. at 272-76. The Court concluded, "[W]e hold that [the border patrol agent] had reasonable suspicion to believe that [the driver of the minivan] was engaged in illegal activity." Id. at 277. The Court explained:

> It was reasonable for [the border patrol agent] to infer from his observations, his registration check, and his experience as a border patrol agent that [the driver of the minivan] had set out from Douglas along a little-traveled route used by smugglers to avoid the 191 check point. [The officer's]

---

[15]These seven factors included the driver's slowing down when passing the border patrol car, the driver's failure to acknowledge the presence of the border patrol officer as the driver drove past the officer's car, the raised position of the knees of children passengers in the minivan, and the odd-appearing waving of the children as the minivan was driven past the border patrol vehicle. 534 U.S. at 272.

[16]These three factors included the roads used by the smugglers, the time proximity between the minivan's activity and the border patrol officers' shift change, and the use of minivans by smugglers. Id.

> knowledge further supported a commonsense inference that [the driver] intended to pass through the area at a time when officers would be leaving their backroads patrols to change shifts. The likelihood that [the driver] and his family were on a picnic outing was diminished by the fact that the minivan had turned away from the known recreational areas accessible to the east on Rucker Canyon Road. Corroborating this inference was the fact that recreational areas farther to the north would have been easier to reach by taking 191, as opposed to the 40-to-50-mile trip on unpaved and primitive roads. The children's elevated knees suggested the existence of concealed cargo in the passenger compartment. Finally, . . . [the officer's] assessment of [the driver's] reactions upon seeing him and the children's mechanical-like waving, which continued for a full four to five minutes, were entitled to some weight.
>
> . . . A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct. . . . Taken together, we believe they sufficed to form a particularized and objective basis for [the officer's] stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment.

Id. at 277-78. See also United States v. Horton, --- F.3d ---, No. 09-3032, 2010 WL 2890021 at **2-3(8th Cir. July 26, 2010).

Defendant Rivera argues that there were no articulable facts that indicated a reasonable suspicion of criminal activity and that inconsistent, but not mutually exclusive, travel plans do not provide a lawful basis for reasonable suspicion. This argument is without merit. Conflicting statements by the occupants of a vehicle about their travel may be sufficient to establish the required reasonable suspicion to detain the occupants for further investigation. United States v. Bracamontes, supra at *2. And, of course, the federal agents had more information than that learned at the stop.

Prior to the Cobalt automobile being stopped on March 29, the federal agents knew facts that gave rise to a reasonable suspicion that criminal activity either was then being committed or would be committed. These objective, articulable facts were (1) the unusual use of a legal permanent resident card for identification when registering at the hotel; (2) payment for the hotel room with cash; (3) the recent use of the legal permanent resident card to cross the border into the United States; (4) the subjects' Chevrolet Cobalt automobile having "a lived-in look" as it sat on the hotel parking lot, with clothing and empty drink containers scattered about the inside of the vehicle; (5) the covering of the ignition switch area inside the Cobalt with the possible intent

- 13 -

to hide the fact the ignition had been damaged illegally; (6) the operation of the vehicle by someone other than the lessee of the vehicle, in violation of the rental agreement; and (7) Rivera and Vazquez walking widely around the hotel parking lot, apparently engaged in counter-surveillance. These facts reasonably supported a suspicion by the federal officers that Rivera and Vazquez had recently entered the United States, had obtained a rented Chevrolet Cobalt and were driving it without authorization, and that they were afraid of being investigated.

Furthermore, when asked for identification, Vazquez used his legal permanent resident card, not a driver's license. Rivera had no identification document and insisted he was illegally in the United States, in spite of the agent's assertion that Rivera might have entered the country legally. Further, the agent learned from further questioning Vazquez that, curiously, Rivera was traveling to visit Vazquez's sick grandmother because Vazquez's driver's license had been revoked and Rivera was needed to drive. However, the agent learned that Rivera did not himself have an American driver's license.

Defendant Rivera argues that the holding in United States v. Jerez, 108 F.3d 684 (7th Cir. 1994), is applicable to this case. The undersigned disagrees. In Jerez, the circumstances of the police encounter with the defendants were entirely different. In that case, the two officers persuaded the defendants to open their motel room door around 11:00 p.m. by continuing to knock on the room door for several minutes and then to knock on the window of the room for several minutes, interposed with the failure of the occupants to respond to the knocking before the knocking was continued, stating loudly enough to be heard in the room that they were the police and would like to talk with them. When one of the subjects opened the motel room door in his underwear, with his companion in bed, the officers asked whether they could speak with them. The occupants agreed and let the officers into the room where the occupants thereafter orally consented to a search of the room during which the officers had the occupants stand in a certain location near the bathroom. 108 F.3d at 687-88.

The district court concluded that the contact between the two subjects was a voluntary encounter, which did not involve the Fourth Amendment, and denied the motion to suppress the cocaine seized from the occupants' luggage. The Court of Appeals reversed and held that the

seized evidence should have been suppressed. The court held that the initial contact between the officers and the subjects was not a voluntary encounter. The court considered that the time and place of the encounter with the police, late at night and at the subjects' place of repose, made them specially vulnerable to police activity. The court concluded that the circumstances indicated that the officers refused to take the occupants' failure to respond to the knocking as a refusal to take no for an answer, and that the officers would not desist unless their request for contact with the occupants was accepted. Therefore, the court held that the contact between the police and the subjects was in the nature of an investigatory stop for which there needed to be a reasonable suspicion supported by articulable facts that criminal activity was afoot. Id. at 690-93. Ultimately, the court concluded that the facts that defendant Solis had a two-door vehicle (a "target" vehicle), that the vehicle was licensed in Florida (a source state), that the vehicle was parked near an airport and an interstate, and that Solis had a criminal history of a suspended driver's license and an arrest or a conviction for smuggling unknown contraband into a Florida jail, were legally insufficient to support a reasonable suspicion that the subjects had or were about to commit a crime. Id. at 694. Jerez is not apposite factually to the case at bar.

In the totality of the circumstances, the agents were authorized to temporarily detain Rivera and Vazquez for further investigation, based on the articulable reasonable suspicions the agents had.

The oral statements to the agent by defendant Rivera on March 29 should not be suppressed. The government has the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972). The admissibility of the statements depends upon whether they are constitutionally voluntary, Colorado v. Connelly, 479 U.S. 157, 163-67 (1986); and, when the statements are made during police interrogation while the defendant was in custody, whether the defendant had been advised of his Miranda rights; and, if so, whether the defendant knowingly and voluntarily waived the rights, North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979). The admissibility of statements does not require that they be preceded by an advise of rights, if the person who made the statements was not in custody or was not the subject of

interrogation when the statements were made.  Miranda, 384 U.S. at 444-45, 467-68, 478.

Statements are constitutionally involuntary if they are the result of government overreaching, such as mental or physical coercion, deception, or intimidation.  Connelly, 479 U.S. at 167.  Nothing in the record indicates that the statements made by Rivera and Vazquez on March 29, 2010 were involuntary.  There was no evidence of any physical or mental coercion by Agent Chapman or the other federal agents.

It is undisputed that on March 29 the agents did not advise Rivera of his rights under Miranda.  The government argues, and the undersigned concludes from the facts, that neither Rivera nor Vazquez was in custody for Miranda purposes during the agents' questioning of them.  The advise of rights requirement of Miranda does not apply to interrogation during stops authorized as traffic stops or otherwise authorized under Terry v. Ohio.  Persons so detained temporarily are not "in custody" for the purposes of Miranda.  Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984); United States v. Morse, 569 F.3d 882, 884 (8th Cir. 2009).  No evidence indicated that Rivera on March 29 was subject to greater control and limitation of his freedom of movement than that associated with a temporary detention for further investigation.  And, when the agents discovered no contraband or other substantial evidence, Rivera and Vazquez were allowed to leave.

Defendant argues that his consent to search the Cobalt was invalid, because it was related to the illegal seizure.  For the reasons set forth above, the undersigned concludes that the temporary detention for further investigation on March 29 was lawful.

Further, on March 29, both Vazquez and Rivera voluntarily gave oral consent[17] to the agent for the officers to search the Cobalt.  Rivera's consent was voluntary, because it was freely given and not "the product of duress or coercion, expressed or implied."  United States v. Golinveaux, --- F.3d ---, No. 09-1959, 2010 WL 2925711 at *2 (8th Cir. July 28, 2010).  There was no evidence adduced that the agents in any way, expressly or impliedly, coerced Rivera into consenting to the search.  Factors that are relevant to whether he freely gave his consent

---

[17]There is no dispute that Rivera, the driver of the vehicle, signed a written consent to search form, the whereabouts of which are now unknown.

to the search include the following. On March 29, 2010, Rivera was 34 years of age. He was a mature individual, married with children, and employed as a professional driver. He was able to converse with Agent Chapman in Spanish in an understandable manner. No evidence indicated he was intoxicated by alcohol or drugs. He had no criminal record known to the agent, other than his assertedly being in the United States illegally. He was not given his Miranda rights. The detention of Rivera and Vazquez on March 29 was of relatively short duration; they were not taken from the location of the traffic stop. No threat or promise or intimidation was used by the law enforcement to get Rivera to consent. The consent and the search occurred in a public place. And there was no evidence that Rivera objected to the search. Id. at 4-5. Rivera's consent was voluntary. The warrantless search of the Cobalt was lawful. United States v. Luna, 368 F.3d 876, 878-79 (8th Cir. 2004). The car was searched, but nothing was seized.

The motion to suppress should be denied as to the oral statements made by defendant Rivera on March 29 to the agents.


April 11, 2010

On April 11, 2010, federal law enforcement agents seized items during the search of the Chevrolet Cobalt automobile, defendant Rivera made statements to the agents, and items were seized from his person after his arrest. Rivera seeks the suppression of this evidence, because the warrantless stop of the Cobalt was not based upon sufficient facts that established a reasonable suspicion that the defendants were engaged or about to engage in criminal activity, and because any subsequent consent to search the vehicle was tainted by the unlawful stop.

The stop of the Cobalt automobile on April 11 did not involve a traffic stop. No violation of any traffic law was observed or used as a reason for approaching Rivera and Vazquez at the gas station.

Rather, the agents were authorized to temporarily detain Rivera and Vazquez for investigation, as they had on March 29, because the totality of the circumstances of April 11 established reasonable articulable factual grounds for believing that Rivera and Vazquez either were committing a criminal act or were about to do so. At the time he walked up to the defendants, these facts are (1) the facts set forth in

- 17 -

Findings 10 and 11 about the report from the hotel personnel; (2) the absence of a red passenger vehicle, but the presence of the same silver Chevrolet Cobalt automobile he saw in another Drury Inn hotel parking lot less than two weeks earlier; (3) Rivera, Vazquez and the other two individuals engaging in apparent counter-surveillance activities in the parking lot and waving to one of the hotel room windows; (4) the apparent observation and change of behavior by Rivera and Vazquez when they drove past the police officer in the unmarked vehicle; and (5) their driving into a second gas station soon after getting gasoline in another one. Agent Chapman, of course, also recollected on April 11 the similarly suspicious circumstances of the March 29 incident. Therefore, the agents were authorized under the Fourth Amendment to detain Rivera and Vazquez for further investigation.

Agent Chapman walked up to Rivera and Vazquez as they were sitting together at the gas station. Rivera and Vazquez were then separated and questioned. Rivera argues that his statements should be suppressed, because he was not given his Miranda rights. The issue before the court is whether Rivera's freedom of movement was restricted to the degree that he was in custody for Miranda purposes. United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006). This requires consideration of whether he was formally arrested or his freedom of movement was limited to the degree "associated with a formal arrest." Id. The facts are clear that, when Agent Chapman asked Rivera about his travels (see Finding No. 15), Rivera had not been formally arrested. Nevertheless, Rivera and Vazquez were separated and the agents had set up a "loose perimeter" around the gas station. While Rivera did not recognize Agent Chapman from the March 29 incident, he knew he was dealing with law enforcement from the likely sighting of the undercover police vehicle as he drove from the hotel. Under all the circumstances, the undersigned concludes that this mix of relevant factors is somewhat similar to those present in Oregon v. Mathiason, 429 U.S. 492 (1977). Those circumstances included the police investigating a burglary of which the defendant was suspected. He went voluntarily to the police station where he sat down with an officer and within five minutes admitted the offense. He was then given his Miranda rights and he gave a taped confession. 429 U.S. at 493.

In Rivera's case, the agents were authorized to detain him and Vazquez a limited period of time for further investigation. Although

some measure of control was applied to Rivera, it was no greater than sitting down with an officer in a police station. And the time it took for Agent Chapman to ask the questions and get the answers described in Finding No. 15, above, was brief. Thereafter, the agents acquired other information, from sources other than Rivera, that established probable cause to arrest him. See below. For these reasons, Miranda warnings were not required before Agent Chapman questioned Rivera.

Further, the items seized from the Cobalt on April 11 should not be suppressed. Even though Rivera was temporarily detained when questioned by the agent, he still voluntarily consented to, and thus constitutionally authorized, the warrantless search of the Cobalt vehicle. See United States v. Menteer, 350 F.3d 767, 770 (8th Cir. 2003). For the reasons set forth above regarding the March 29 consent to search, in the totality of the circumstances on April 11, including the questioning of Rivera in custody without having Mirandized him, Rivera's consent to search the vehicle, orally and in writing, was voluntary. He was not coerced into cooperating and consenting to the search.

When the agents learned what was seized from the truck and trailer, with the information about Rivera and Vazquez that linked them to Sones and Varela, they had probable cause to lawfully arrest them without a warrant. Beck v. Ohio, 379 U.S. 89, 91 (1964). Incident to his lawful arrest, Rivera was searched and items lawfully seized from him. New York v. Belton, 453 U.S. 454, 461 (1981); United States v. Edwards, 415 U.S. 800 (1974) (clothing taken from arrestee at police station is seized incident to the arrest).

### ORDER AND RECOMMENDATION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motion of defendant Ramon Vazquez-Rodriguez to sever (Doc. 103) is denied without prejudice.

**IT IS FURTHER ORDERED** that the motions of defendant Marco Antonio Rivera-Apodaca for disclosure of impeaching evidence (Doc. 100) and for disclosure of Rule 404(b) evidence (Doc. 101) are denied without prejudice as moot.

**IT IS HEREBY RECOMMENDED** that the motion of defendant Marco Antonio Rivera-Apodaca to suppress evidence (Doc. 99) be denied.

The parties are advised that they have until close of business on September 7, 2010, to file written objections to this Order and Recommendation. The failure to file timely written objections may result in a waiver of the right to appeal issues of fact.

**ORDER SETTING TRIAL DATE**

At the direction of District Judge Rodney W. Sippel, the jury trial of this action is set for **October 4, 2010, at 9:00 a.m.**

    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 20, 2010.